No. 3640

Second Circuit

(Second Division)

MANY OIL CO. v. S. H. BOLINGER & CO., INC.

(July 16, 1931. Opinion and Decree.)

R. A. Fraser, of Many, attorney for plaintiff, appellee.

W. H. Scheen, of Shreveport, and Boone & Boone, of Many, attorneys for defendant, appellant.

CULPEPPER, J. Plaintiff, a commercial partnership, instituted suit against defendant corporation to recover the sum of

$358.45 with legal interest, as balance due on alleged sales of gasoline, kerosene, and lubricating oils, to defendant under a written contract. Defendant answered, admitting the existence of the contract, but denied that the debt sued on came under the terms of the contract, or that defendant was in any way liable for the debt, and averred that the items sued for were not sold and delivered to it, but, if ever sold at all, they were sold and delivered to other persons in which it had no interest or concern.

From a judgment for plaintiff as prayed for, defendant prosecutes this appeal.

Plaintiff company sues as the admitted successor to a former partnership composed of R. E. Bishop, W. I. Williams, Jr., and others. On August 7, 1922, Bishop and Williams entered into a contract with defendant, S. H. Bolinger & Co., represented by R. H. Sutton as its manager, at Many, Sabine parish, where defendant was engaged in a general sawmill, planer mill and lumber business, in which contract it is set forth, among other things, that:

"Whereas, party of first part (which was Bishop and Williams) is in the wholesale gasoline, kerosene and lubricating oils business and desires to furnish same to party of the second part (which was defendant herein) and

"Whereas, party of the second part is engaged in the lumber industry within a radius of twenty-five miles of Many, Louisiana, from party of the first part, they do enter into the following binding contract and agreement of purchase and sale, to-wit:—"

Here follows an obligation on part of first party to furnish second party a sufficient quantity of gasoline and oils to meet second party's needs, and to sell same to second party at a price of one cent a gallon under the prevailing local tank wagon price. Second party binds itself to purchase from first party all of its gasoline and oils during the life of the contract, which was to be three years. First party bound itself to keep a stock of gas and oils on hand and to deliver same to the pumps located on properties of second party within a radius of twenty-five miles from Many, where second party agreed to furnish first party a tank and storage warehouse of sufficient size to meet first party's needs. It was further agreed that liquidated damages for the violation of the terms of the contract by either party should be based upon profits previously made. It was stipulated that first party should not be prohibited from selling its products to other parties in that locality. After the contract had been signed by the defendant company, per R. H. Sutton, manager of its Many plant, it was submitted to and signed in approval by Mr. W. B. Bolinger, secretary of defendant company, at Shreveport, where its domicile and general office was located.

R. H. Sutton, who executed the contract on behalf of the defendant, was the active manager of the defendant company's business at Many at the time purchases of gas and oil under the contract were begun, and continued as such until about the first of September, 1927, when Mr. S. H. Bolinger, vice-president of defendant company, came to Many from Shreveport and took over its management. The accounts of the sales under the contract were opened up in the name of the S. G. Bolinger Lumber Company upon the books of plaintiff. The various named mills carried on the books for which it appears that gas and oil were ordered by defendant under the contract, were as follows: Joe Rivers, Dave No. 1, Dave No. 2, Sutton & Smith Planing Mill, Roy Lumber Company, Sutton & Smith Horan Mill, and Hardwood Mill; seven con-

cerns apparently in all. Sales for each mill were entered under the respective subtitle or name on the books, the main heading of the page of which showed the whole charged to defendant. The statement of the account as filed in evidence so indicates this manner of making the entries. At any rate, separate accounts were kept of the sales to each concern, and all of them were charged to defendant company. The business under the contract continued in this manner for about a year and a half. The evidence is not clear as to just how many of these little mills were owned outright by defendant company; or whether any of them were. Mr. Gleason, a member of plaintiff firm, testifying for plaintiff, says he thinks the one called Hardwood Mill belonged to Mr. Bolinger personally. Defendant, for some reason, has not furnished the court with information as to the ownership of these various plants. Mr. Gleason, not being familiar with the real owners, was unable to furnish this information. Defendant, of course, did not appear concerned with ownerships of the plants, we presume on the theory that, at least as to Dave No. 1, the concern for whose account this suit was brought, defendant entertained no interest or concern inasmuch as defendant did not own Dave No. 1. The point is this, if we knew the ownership of each and every one of the several little mills which Mr. Sutton ordered out gas and oil for, it might give us a better idea of whether he meant to confine his orders to such as were owned outright by the defendant, or in which defendant, or some stockholder or officer or employee, merely had an interest; or whether it was intended that gas and oil were to be bought for every concern which sold its output to defendant, and for which reason defendant felt an interest in assisting to the extent of guaranteeing its necessary supply of gas and oil in order to keep them all running. It would be not at all unreasonable to assume the latter was the intention of the parties to the contract, as by buying gas and oil for each unit or plant or concern, from which defendant was to derive material with which to operate its planer mill in Many, it might insure itself against uncertainties in deliveries of lumber and thus enable it to continue operating without interruption. It is certain that Dave No. 1 was owned by a corporation in which Mr. Sutton had an interest, although defendant corporation, of which Sutton was manager, had none. It appears equally certain that Mr. Sutton evidently began to order gas and oil delivered under the contract to that concern to begin with. Although Mr. Gleason declares orders for Dave No. 1 were made under the contract, and defendant denies it in answer, no definite proof to the contrary was offered. Mr. Sutton, who was the manager for defendant at the time these alleged sales were made, did not appear and testify to deny that he as manager included his Dave No. 1 in among the other concerns for which he gave orders under the contract. The orders for Dave No. 1 were charged to defendant on plaintiff's books. Statements seem to have been rendered regularly by plaintiff of the Dave No. 1 account shown thereon charged to defendant direct, in the same manner that the others were being charged. Defendant was bound to have known, if not at first, then later, that the Dave No. 1 account was being charged to defendant along with the other little mills.

Mr. Gleason explains how his company kept the account. Speaking of the charge sheet or work sheet, which are itemized monthly statements, Mr. Gleason says:

"These are what are called work sheets or delivery sheets of the various amounts here, Sutton & Smith, Hardwood Mill, Dave No. 1 and Dave No. 2, mills which fur-

nished material to the Hardwood or Planer Mill here in Many, and the different parties at the different mills, that was kept simply as a matter of assistance to G. H. Bolinger and Company in charging the different accounts or different amounts to the different mills, showing the amounts used by them, and while it was all charged to S. H. Bolinger and Company, the different mills were put on here, for their assistance in separating them, so as to toll the total amount each month, and that was mailed out."

Witness says he rendered defendant each month itemized monthly statement; that all payments on these statements were made by defendant company, and in fact no one other than defendant company was ever charged with any of these accounts, and no demand ever made upon any other person. He says sometimes he mailed these statements to defendant at Many, and at other times to Shreveport, and that after defendant began falling behind on the account he began mailing statements to both Many and Shreveport each month. Payment on the account for Dave No. 1 mill began to fall short in May, 1927, and continued falling short until up in September when the shortage reached an aggregate sum of $358.45, at which time it seems further deliveries to that mill were discontinued. After repeated unsuccessful efforts to collect from defendant, plaintiff filed suit against defendant on this account. Defendant answered, setting up as a defense that the gas and oil representing the sales alleged on were not sold nor delivered to defendant; that if such sales were ever made at all, they were made to persons other than defendant, in which defendant had no interest or concern. The contest in this case therefore is whether gas and oil, with which the Dave No. 1 mill was supplied, were supplied by sale under the existing contract, or were sold direct to it on its own account, and in no

way connected with the contract. If these sales were made under and by virtue of the contract, defendant is liable; otherwise it is not.

The contract does not specify what mill plants within the twenty-five mile radius of Many were to be supplied with gas and oils. There are shown on plaintiff's books to have been some half dozen of them, among which was the Dave No. 1, all of which appear to have been carried in the same manner, as was explained in detail by Mr. Gleason. These mills constituted small portable sawmills scattered throughout the territory within a radius of twenty-five miles from Many, and were moved from place to place. It appears from the testimony that they were principally engaged in sawing up timber which belonged mostly to defendant company, and delivering their output to defendant's planer mill in Many.

Mr. Cooper, secretary of Dave Lumber Company which owned and operated Dave No. 1, testified that his company had a contract at the time with G. H. Bolinger & Co., under which his company was to deliver and did deliver to the Bolinger Company the entire output of his company's mill. Although the testimony is not clear on the point, we gather from it that Dave Lumber Company owned Dave Numbers 1 and 2, and the company's contract to deliver output included both mills. Mr. Bolinger, secretary of defendant company, testifies that Dave Lumber Company cut timber which belonged to defendant company part of the time and part of the time "we sold them the timber, turned over to them." He says at first, however, that Dave Lumber Company owned their own timber. He says his company bought the output. He also says his company was interested in seeing that Dave Lumber Company paid its debts, as he did not want attachments run

on the lumber. Mr. Bolinger admits on cross-examination that his company had notice from time to time that plaintiff was furnishing all these little sawmills, including Dave No. 1 and No. 2, gasoline and oil, and admits receiving bills monthly showing these several mills; also admits paying these monthly accounts sometimes, but he says "not all of them." He admits his company made advances to them. Yet, Mr. Bolinger, notwithstanding these admissions, permitted his company to run along for nearly two years in this manner, and, when confronted with this account for gas and oil furnished to Dave Mill No. 1, denied his company owed it, on the ground that the sales, if made at all, were made "to other persons and to which it had no interest or concern." This does not sound reasonable under the circumstances.

These and other circumstances, as disclosed by the record, strongly indicate that defendant company had placed Dave Mill No. 1, along with all of the rest of defendant's little feeder mills, on the list to be furnished gas and oil under defendant's contract with plaintiff. Mr. Cooper, secretary and stockholder in the Dave Lumber Company, testified that it was his understanding that the Dave No. 1 account had all been paid at the time the question arose regarding its payment. This statement indicates that Mr. Cooper expected Bolinger Lumber Company to pay, and thought it had paid for Cooper's company.

Another significant fact testified to by Mr. Cooper was that his company immediately discontinued buying gas and oil from another oil concern when plaintiff began selling under its contract, and began getting all of Cooper's company's oil from plaintiff; thus indicating that Cooper's company was in on the deal.

R. H. Sutton was vice-president of Dave Lumber Company at the time he, as manager of G. H. Bolinger Lumber Company executed the contract with plaintiff. Why should he not have intended to include his mills in with the others? It would have been the natural and logical thing to do. As a matter of fact, we think, as did the judge of the lower court, that he did do it, and that Mr. Bolinger approved of it; if not directly, he approved of it indirectly. Cooper also says that the Dave Lumber Company had no special contract with plaintiff company whereby it bought its gas and oil from plaintiff; yet he says Dave Lumber Company enjoyed the benefit of the cut in the price of gas and oil along with and in the same manner as did the other little mills under the contract. For these reasons, we think the judgment of the lower court correct, and same is therefore affirmed.